```
                    UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL S. O'CONNOR,              :
                                  :
        Plaintiff                 :     CIVIL NO. 4:11-CV-01214
                                  :
    vs.                           :     (Judge Conaboy)
                                  :
MICHAEL J. ASTRUE,                :
COMMISSIONER OF SOCIAL            :
SECURITY,                         :
                                  :
        Defendant                 :
```

## MEMORANDUM

### BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Michael S. O'Connor's claim for social security supplemental security income benefits.  The primary medical impairment suffered by O'Connor is a below knee amputation of the right leg. O'Connor uses crutches and contends that he is unable to use a prosthesis because it irritates and causes infections at the stump of the amputated leg.  O'Connor also contends that he suffers from disabling mental impairments, including a learning disorder.

There are basically two issues in the present case. The first issue relates to the administrative law judge's identification of O'Connor's severe and non-severe medically determinable impairments at step two of the sequential evaluation process.  The second issue is two-fold in that it relates to the administrative law judge's analysis at step three of the sequential evaluation process and the consideration of the testimony of a

third-party witness Deborah Strohm, O'Connor's girlfriend, with respect to that analysis. Ms. Strohm testified regarding O'Connor's alleged inability to wear a prosthetic device. Tr. 591-595.[1] An administrative law judge denied O'Connor's claim for supplemental security benefits on April 15, 2010, and the Appeals Council declined to grant review on May 2, 2011.  The present appeal[2] was filed on June 27, 2011, and became ripe for disposition on December 5, 2011, when O'Connor filed a reply brief.

**STANDARD OF REVIEW AND SEQUENTIAL EVALUATION PROCESS**

Under 42 U.S.C. § 405(g) and relevant case law, the court is limited to reviewing the administrative record to determine whether the decision of the Commissioner is supported by substantial evidence. Counsel for the parties are familiar with the five-step sequential evaluation process that the Commissioner utilizes and the substantial evidence standard of review.  For the reasons set forth below we will vacate the decision of the Commissioner denying O'Connor supplemental security income benefits and remand for further proceedings.[3]

---

1. References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on September 6, 2011.

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

3. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a
                                                              (continued...)

**DISCUSSION**

　　　　A previous action was filed by O'Connor in 2009. O'Connor v. Astrue, Civil No. 09-238 (M.D.Pa. filed February 2, 2009)(Muir, J.).  In that action O'Connor claimed that he became

---

　　3.  (...continued)
conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).
　　　　Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).
　　　　The Commissioner utilizes a five-step process in evaluating disability insurance benefits and supplemental security income claims.  See 20 C.F.R. §§ 404.1520 and 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.

disabled on April 10, 2000, and challenged the Commissioner's denial of his applications for disability insurance benefits and supplemental security income benefits. O'Connor's date last insured for disability insurance benefits was September 30, 2000.[4]

The administrative law judge in that prior action went through the five-step sequential evaluation process and concluded that O'Connor had not engaged in substantial gainful activity since April 10, 2000; O'Connor suffers from a severe impairment of "residuals of right-sided below the knee amputation" and the non-severe impairments of degenerative disc disease of the lumbar spine, depression, alcohol abuse and a learning disability; O'Connor's impairments did not individually or in combination meet or equal a listed impairment; O'Connor could not perform his prior relevant work as a bakery helper but that he had the residual

---

4.  Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." In order to establish entitlement to disability insurance benefits O'Connor was required to establish that he suffered from a disability on or before the date last insured.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).
    Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

functional capacity to perform a limited range of sedentary work including work as an order clerk and inspector. Tr. 55-65.

At step three of the sequential evaluation process the administrative law judge considered Listing 1.05B which provides as follows:

> 1.05 Amputation (due to any cause).
>
> \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*
>
> B. One or both lower extremities at or above the tarsal region, with stump complications resulting in <u>medical inability to use a prosthetic device to ambulate effectively</u>, as defined in 1.00B2b, which have lasted or are expected to last for at least 12 months;
>
> \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

(Emphasis added.)  The administrative law judge found that O'Connor's amputation did "not meet the requirements of Section 1.05 of the Listings, because he does not have stump complications resulting in the medical inability to use a prosthetic device to ambulate effectively, which have lasted or were expected to last for at least twelve months."  Tr. 58-59.  In so finding the administrative law judge relied on testimony from a medical expert, Haddon C. Alexander, M.D., who stated that "there was no objective medical evidence as to why the claimant could not wear the prosthesis."  Tr. 74.  The Appeals Council declined review and as stated above O'Connor filed an action in this court which was assigned to Judge Muir.

Judge Muir on August 28, 2009, issued an order affirming the decision of the Commissioner with respect to O'Connor's application for disability insurance benefits.  Specifically, Judge Muir found that O'Connor's date last insured for entitlement to disability insurance benefits was September 30, 2000, and that substantial evidence supported the Commissioner's decision that O'Connor could engage in sedentary work and was not disabled prior to November 1, 2006.  With respect to O'Connor's claim for supplemental security income benefits Judge Muir remanded the case for the limited purpose of further consideration of medical evidence from on and after November 1, 2006.

Judge Muir in a lengthy memorandum set forth his reasons for remanding the case for further proceedings.  In relevant part Judge Muir stated as follows:

> O'Connor  has a 11th grade education and can read, write and understand English.  Tr. 101.  O'Connor is not married and has no children.  Tr. 194.
>
> O'Connor has a limited work and earnings history.  At the time of the onset of his alleged disability O'Connor was working for Pizza Hut "mix[ing] the pizza dough." Tr. 291 and 314-316. In 1979, at the age of 13, O'Connor had a below the knee amputation of his right leg. Tr. 339.  He was prescribed a prosthetic limb but because of skin irritations to his stump he rarely used the prosthetic limb.  Tr. 393.  He has had a long history of problems with the prosthetic limb and stopped wearing the prosthetic limb in 1989 after suffering a fracture to his right leg in a bicycle accident. Tr. 338 and 458. In 1992, O'Connor again fractured his right leg when diving into a pool. Tr. 458. The administrative record reveals that during the 70s, 80s, and 90s, he had educational difficulties, abused alcohol and suffered from depression. Tr. 208-275 and 334-340. On July 3,

1995, he was evaluated and diagnosed by Joseph Levenstein, Ph.D., with alcohol dependence and alcohol-induced persisting dementia and Dr. Levenstein was of the opinion that O'Connor had "no motivation for recovery." Tr. 345. Dr. Levenstein in his report of the evaluation dated July 16, 1995, stated as follows:

> At age 13, Mr. O'Connor was playing on the railroad tracks, and was run over by a train, causing the amputation of his leg. He has twice broken his leg, in 1989 and 1992, apparently exacerbating his problems with his prosthesis. He was drinking both times he broke his leg.
>
> After he lost his leg, Mr. O'Connor began drinking, typically on weekends with friends. He would drink until he threw up or passed out. By age 16, he was drinking daily. He has never tried to stop drinking and has never been to rehab. In 1992 or 1993, Mr. O'Connor was arrested for DUI, and had his license suspended. He has decided not to attempt to get it back . . . .
>
> Mr. O'Connor has a long history of problem behaviors. He was in special education in school and was frequently truant. His truancy increased after the accident and after he began drinking. In the twelfth grade, he dropped out of school . . . .
>
> Mr. O'Connor was born and raised in Coraopolis. Both his parents were alcoholics, and Mr. O'Connor recalled that his mother was able to outdrink him when he was a young man. . . .
>
> Following high school, Mr. O'Connor worked in a variety of settings, usually as a short-order cook. He would hold that job for a few months and then get fired for coming in drunk . . . .
>
> His intelligence is estimated to fall in the borderline range . . . virtually all of his emotional and behavioral problems could realistically be attributed to chronic alcoholism. He appears to be a late stage alcoholic, and therefore even minor stressors will trigger drinking episodes. He has no motivation for recovery and little insight into his condition.

Tr. 341-345.  Dr. Levenstein further stated that O'Connor "has sufficient cognitive capacity to understand, retain, and follow simple to moderately complex instructions."  Tr. 345.  Because O'Connor claims he became disabled on April 10, 2000, these pre-April 10, 2000, records have little relevance to the present disability claim other than to give some historical background and give an indication of his prior relevant work.

O'Connor has prior relevant work as a bakery helper a job that O'Connor performed on crutches at the unskilled, light work level. He also performed the work at Pizza Hut on crutches.  Social Security Administration earnings records reveal that O'Connor in 1984 earned $2310.40, in 1985 $4218.69, in 1986 $2616.27, in 1987 $3290.32, in 1988 $5670.80, in 1989 $5147.85, in 1994 $2256.75, in 1999 $8644.74 and in 2000 $1439.62.  Tr. 200.  No earnings are reported for 1990 through 1993 and 1995 through 1998.  Tr. 200.  O'Connor has not worked since April 10, 2000.

O'Connor has a history of criminal misconduct.  In 1994 he was incarcerated for burglarizing his uncle's business. Tr. 458.  He apparently violated parole in 2001 and was again incarcerated.  Tr. 293.  He was released from a state prison in late September, 2006.  Tr. 389.  It is not clear that O'Connor's incarceration was continuous from 2001 to September, 2006.  However, the administrative record does contain medical records from early 2004 to September 19, 2006, from state correctional institutions.  Tr. 389-453.  A psychological assessment report of O'Connor by Kathleen O. Parson, M.Ed., dated March 25, 2004,  while O'Connor was incarcerated in a state prison reveals that O'Connor's IQ is 88 and his intellectual rating is low average.  Tr. 423.  An entry in prison records from the State Correctional Institution-Smithfield dated January 25, 2006, indicates that O'Connor "is a certified chef and baker and plans to work when he gets out.  Mr. O'Connor is missing part of his leg but he said he makes money and doubts if he will apply for SSDI."  Tr. 412.  An entry in prison records dated June 1, 2006, reveals that O'Connor commenced planning to apply for social security benefits. Tr. 412.  O'Connor protectively filed his applications for disability insurance benefits and supplemental security income benefits on September 7,

2006, when he was still incarcerated at the State Correctional Institution-Smithfield. Tr. 411.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

The error committed by the administrative law judge as will be more fully explained below relates to developing the record with regard to medical records from late 2006 and 2007.

The administrative record reveals that O'Connor was incarcerated in early March 2004 in a state correctional institution. Tr. 451-452. As stated above one of the claims of O'Connor is that he declines to wear the prosthesis because it irritates and causes infections to the stump of his below knee amputation. While in prison, O'Connor stated that he had a prosthetic leg at home, but chose not to use it. Tr. 451.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

The only evidence of a significant problem with irritation to O'Connor's stump after his alleged onset date is from November, 2006. Tr. 533 and 535. On November 23, 2006, O'Connor visited the emergency department of Harrisburg Hospital complaining of pain to the stump of his right leg. Tr. 535. The physical examination revealed six small pustules on the stump of his right knee. Tr. 535. Swelling (effusion) was observed at the knee joint. Fluid was removed from the knee joint using a catheter and sent to the laboratory for analysis. Tr. 535. The attending physician started O'Connor on a topical antibiotic and prescribed Vicodin for pain. The diagnosis was "cellulitis about the right knee." Tr. 536. On November 28, 2006, O'Connor had the knee reexamined at the emergency department of the Harrisburg Hospital. Tr. 533. The report of that visit states in pertinent part as follows: "There is a pustular lesion to the top of the knee with about 1.5 cm of surrounding erythema. He has broken pustules on either side of the knee. He does not appear to have a knee effusion at this time. Except for the isolated area of redness around the one lesion, there is no increased warmth or erythema." Tr. 533. O'Connor was discharged from the emergency department with instructions to continue using the topical antibiotic until it was gone and he was also instructed to use warm compresses. Tr. 533. He was advised to follow-up with an orthopedist. Tr. 533.

On February 1, 2007, Raymond E. Dahl, D.O., an orthopedic specialist, examined O'Connor. Tr. 528. Dr. Dahl found that O'Connor was pleasant and cooperative. Tr. 528. O'Connor complained that his prosthesis was causing sores. Tr. 528. However, the physical examination revealed that O'Connor's right stump was clean, dry and intact, with only a small ½ centimeter area of "somewhat" cracked skin. Tr. 528. Dr. Dahl found that O'Connor had good motor function in both lower extremities and recommended no further treatment, but referred O'Connor for a fitting of a new prosthesis. Tr. 528. The administrative record reveals that O'Connor's insurance carrier denied the request for a new prosthetic leg and Dr. Dahl wrote a letter to the carrier stating it was medically necessary. Tr. 527. There is no indication in the record as to how this dispute was resolved.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Of great importance is the fact that with respect to O'Connor's claim for disability insurance benefits no treating or examining physician has stated that O'Connor was totally disabled on or before September 30, 2000. No physician has indicated that during the period from April 10, 2000, through September 30, 2000, O'Connor was unable to engage in the sedentary work identified by the vocational experts.

The fact that O'Connor used two crutches or two canes does not automatically result in a finding that O'Connor met listing 1.05. No physician has indicated that O'Connor was unable to wear a prosthesis during the period of April 10, 2000, through September 30, 2000. The records pre-dating April 10, 2000, suggest that it was more a matter of choice on the part of O'Connor to go without a prosthesis rather than a medical necessity. Although the administrative record contains evidence that O'Connor had stump irritations/infections, there is insufficient evidence to conclude that those conditions lasted for the requisite continuous 12 month period required by the Social Security Act. Although at the time of the administrative law judge's decision, O'Connor may have been financially unable to obtain a new, properly fitting prosthesis the evidence does not show that he was medically unable to use a prosthesis for a continuous 12 month period. The burden was on O'Connor to establish stump complications resulting in a medical inability to use a prosthesis. O'Connor failed to meet this burden.

10

> The record relating to O'Connor's claim for supplemental security income benefits is not adequately developed. Particularly issues relating to O'Connor's mental condition on and after November 1, 2006, are not fully developed.
>
> \* \* \* \* \* \* \* \* \* \* \*
>
> The medical and mental health records as stated earlier in this order indicate that O'Connor has low average intelligence and "has sufficient cognitive capacity to understand, retain, and follow simple to moderately complex instructions." Tr. 345 and 423. We find no merit to O'Connor's claim that he did not have the mental ability to perform the duties of an order clerk prior to November 1, 2006. However, the record is not adequately developed with respect to O'Connor's mental condition after that date.
>
> O'Connor contends the matter should be remanded for further proceedings because the administrative law judge did not fully develop the record regarding the GAF scores of 45 and 48 noted in the psychosocial assessment of October, 2007, by the unidentified evaluator at Family Service Partners. We find that this argument has merit only with respect to O'Connor's claim for supplemental security income benefits.
>
> We find no fault with the administrative law judge's conclusion that O'Connor could engage in sedentary work with the limitations noted in his decision prior to November 1, 2006. Our review of the administrative record reveals that the decision of the Commissioner denying O'Connor disability insurance benefits is supported by substantial evidence. However, the decision relating to supplemental security income will be remanded for further proceedings.

Tr. 614-618, 628, 632-633 and 637-639 (footnotes omitted).[5]

---

5. In this quotation from Judge Muir's memorandum we included his citations to the administrative record filed in that case.
(continued...)

11

After the case was remanded to the Commissioner, the same administrative law judge held a hearing on December 22, 2009, and as stated issued a decision on April 15, 2010, denying O'Connor supplemental security income benefits.

The administrative law judge went through the five-step sequential evaluation process.

At step one of the sequential evaluation process the administrative law judge found that O'Connor had not engaged in substantial gainful work activity since September 7, 2006, the date O'Connor filed his application for supplemental security income benefits. Tr. 552.

At step two of the sequential evaluation process, the administrative law judge found that O'Connor had the following severe impairment: status post right below knee amputation. Tr. 552. The administrative law judge found that O'Connor's depressive disorder, anxiety disorder and alcohol abuse, singly and in combination were non-severe[6] impairments because they did

---

5. (...continued)
The administrative record was Document No. 8. O'Connor v. Astrue, Civil No. 09-238 (M.D.Pa. Filed February 5, 2009)(Doc. 8).

6. An impairment is "severe" if it significantly limits an individuals ability to perform basic work activities. 20 C.F.R. §§ 404.1521 and 416.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking,
(continued...)

12

not cause more than a minimal limitation in O'Connor's ability to perform basic mental work activities. Id. One troubling aspect of the administrative law judge's step two analysis is that he did not include a learning disorder as a medically determinable non-severe impairment as he did in his prior decision of June 20, 2008. In finding that O'Connor did not have any severe impairments the administrative law judge rejected several low Global Assessment of Functioning (GAF) scores[7] in the range of 40

---

6. (...continued)
and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual ability to work. 20 C.F.R. §§ 404.1521 and 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

7. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-
(continued...)

to 50 and adopted the GAF score of 55 assessed on December 23, 2009, by T.W. Ponessa & Associates. Tr. 555.

At step three of the sequential evaluation process the administrative law judge found that O'Connor's impairments did not individually or in combination meet or equal a listed impairment. Tr. 553. In so finding, the administrative law judge erroneously and oddly stated that "there is no listing for a below knee amputation." Id.

The administrative law judge went through the remaining steps and found that O'Connor was unable to perform any past relevant work but that he had the residual functional capacity to engage in a limited range of sedentary work.

The administrative law judge included both physical and mental limitations in the residual functional capacity assessment. Tr. 553-554. Specifically, he found that O'Connor was limited to

---

7. (...continued)
40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id. A GAF score of 71 to 80 represents transient symptoms, if present, and expectable reactions to psychosocial stressors or no more than slight impairment in social, occupational, or school functioning. Id.

"unskilled, rote repetitious work that does not require precise attention to detail. He must be able to alternate between sitting and standing at will. The claimant's standing and walking are limited to fifteen to twenty minutes at a time with no more than a total of two hours in an eight hour day. The claimant is limited to jobs which would permit him to use two crutches to ambulate. While using crutches, he is precluded from lifting or carrying. The claimant should never do repetitious stooping or bending. He should never climb or crawl. Furthermore, he is precluded from jobs that would require working around heights or moving machinery." Id.

At step five, the administrative law judge based on a residual functional capacity of a limited range of unskilled, sedentary work as described above and the testimony of a vocational expert found that O'Connor had the ability to perform unskilled, sedentary work as a semi-conductor bonder, carding machine operator and stuffer machine tender, and that there were a significant number of such jobs in the local and national economies. Tr. 556.

The administrative record in this case is 795 pages in length and we have thoroughly reviewed that record. O'Connor argues that the administrative law judge erred by (1) not addressing relevant evidence, (2) failing to consider Listing

1.05(B) and (3) finding that O'Connor did not have a severe mental impairment.  We find some merit in O'Connor's first two arguments.  However, the third argument lacks merit.  The administrative law judge appropriately relied on the GAF score of 55, representing moderate symptoms, in finding that O'Connor did not have a severe mental impairment.  Furthermore, the administrative law judge appropriately included mental functional limitations in O'Connor's RFC assessment.

It is very troubling, however, that the administrative law judge did not mention or address the testimony of O'Connor's girlfriend as well as stating that "there is no listing for a below the knee amputation."

O'Connor's girlfriend with whom he lived for more than two years testified that O'Connor experiences "nasty looking" blister on his stump after using his prosthesis for a week or two. Tr. 590-591 and 594.  She indicated it takes approximately two weeks for the blisters to clear during which Mr. O'Connor places his stump in cold water. Tr. 591-592.  She also observed that the blisters break, which caused greater pain for O'Connor. Tr. 592.

It is legal error for an administrative law judge to fail to consider third-party statements or testimony regarding the functional abilities of a claimant.  Burnett v. Comm'r of SSA, 220 F.3d 112, 122 (3d Cir. 2000); Bunch v. Astrue, Civil Action No.

10-1921, slip op. *15 (M.D.Pa. filed Nov.21, 2011)(Nealon, J.); Oldenburgh v. Astrue, 2009 U.S. Dist. LEXIS 24867 * 26 (M.D. Pa. March 26, 2009)(Muir, J.).  The Social Security regulations and rulings recognize the relevance of statements from family members and others who know a claimant.  See 20 C.F.R. §§ 416.912, 416.913 and 416.929; SSR 96-7p and 96-8p.  Such statements can shed light on a claimant's impairments, limitations, symptoms, functioning and credibility. Id.  This court has on several occasions remanded cases for further proceedings because of an administrative law judge's failure to address statements of third-parties who had contact with and observed an applicant for disability benefits. When an administrative law judge fails to acknowledge and comment on evidence of a parties symptoms, pain and functioning the reviewing district court cannot ascertan if the administrative law judge considered it appropriately.  We cannot determine if the administrative law judge appropriately considered the testimony of O'Connor's girlfriend, Ms. Strohm.

If O'Connor's severe medically determinable impairment of "status post right below knee amputation" met or equaled a listed impairment, he would have been considered disabled per se and awarded supplemental security income benefits. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000).

O'Connor argues that the administrative law judge failed to address Listing 1.05B. We find that that argument has substantial merit. The administrative law judge's step three analysis consisted of the following three sentences: "The clinical findings necessary to meet or medically equal any physical listing, including musculoskeletal listings, are not present. Listing 1.04 is not met or equaled as there is no disorder of the spine resulting in compromise of a nerve root or the spinal cord. Moreover, there is no listing for a below knee amputation." Tr. 553. The administrative law judge did not address Listing 1.05. This statement is too perfunctory for this court to conduct meaningful review. Furthermore, it appears to be erroneous because there is a listing for a below knee amputation – Listing 1.05.

Where a court cannot conduct meaningful review because the administrative law judge has failed to give an adequate explanation for the step three determination remand is appropriate. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d at 119-120. In this case, the administrative law judge failed to give an adequate explanation for his step three finding.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g)

18

vacate the decision of the Commissioner and remand for further proceedings.[8]

    An appropriate order will be entered.

<u>S/Richard P. Conaboy</u>
RICHARD P. CONABOY
United States District Judge

Dated: August 27, 2012

---

8. We strongly recommend that the Commissioner obtain expert medical opinion as to whether or not O'Connor's severe impairment (a below the knee amputation) meets or medically equal a listed impairment on or after November 1, 2006.